Justice BREYER delivered the opinion of the Court.
The Leahy-Smith America Invents Act, 35 U.S.C. § 100 et seq., creates a process called "inter partes review." That review process allows a third party to ask the U.S. Patent and Trademark Office to reexamine the claims in an already-issued patent and to cancel any claim that the agency finds to be unpatentable in light of prior art. See § 102 (requiring "novel[ty]"); § 103 (disqualifying claims that are "obvious").
We consider two provisions of the Act. The first says:
"No Appeal.-The determination by the Director [of the Patent Office] whether to institute an inter partes review under this section shall be final and non-appealable." § 314(d).
Does this provision bar a court from considering whether the Patent Office wrongly "determin[ed] ... to institute an inter partes review," ibid., when it did so on grounds not specifically mentioned in a third party's review request?
The second provision grants the Patent Office the authority to issue
"regulations ... establishing and governing inter partes review under this chapter." § 316(a)(4).
Does this provision authorize the Patent Office to issue a regulation stating that the agency, in inter partes review,
"shall [construe a patent claim according to] its broadest reasonable construction in light of the specification of the patent in which it appears"? 37 CFR § 42.100(b) (2015).
We conclude that the first provision, though it may not bar consideration of a constitutional question, for example, does bar judicial review of the kind of mine-run claim at issue here, involving the Patent Office's decision to institute inter partes review. We also conclude that the second provision authorizes the Patent Office to issue the regulation before us. See, e.g., United States v. Mead Corp., 533 U.S. 218, 229, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) ; Chevron, U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).
I
A
An inventor obtains a patent by applying to the Patent Office. A patent examiner *2137 with expertise in the relevant field reviews an applicant's patent claims, considers the prior art, and determines whether each claim meets the applicable patent law requirements. See, e.g., 35 U.S.C. §§ 101, 102, 103, 112. Then, the examiner accepts a claim, or rejects it and explains why. See § 132(a).
If the examiner rejects a claim, the applicant can resubmit a narrowed (or otherwise modified) claim, which the examiner will consider anew, measuring the new claim against the same patent law requirements. If the examiner rejects the new claim, the inventor typically has yet another chance to respond with yet another amended claim. Ultimately, the Patent Office makes a final decision allowing or rejecting the application. The applicant may seek judicial review of any final rejection. See §§ 141(a), 145.
For several decades, the Patent Office has also possessed the authority to reexamine-and perhaps cancel-a patent claim that it had previously allowed. In 1980, for example, Congress enacted a statute providing for "ex parte reexamination." Act to Amend the Patent and Trademark Laws, 35 U.S.C. § 301 et seq. That statute (which remains in effect) gives "[a]ny person at any time" the right to "file a request for reexamination" on the basis of certain prior art "bearing on the patentability" of an already-issued patent. §§ 301(a)(1), 302. If the Patent Office concludes that the cited prior art raises "a substantial new question of patentability," the agency can reexamine the patent. § 303(a). And that reexamination can lead the Patent Office to cancel the patent (or some of its claims). Alternatively, the Director of the Patent Office can, on her "own initiative," trigger such a proceeding. Ibid . And, as with examination, the patent holder can seek judicial review of an adverse final decision. § 306.
In 1999 and 2002, Congress enacted statutes that established another, similar procedure, known as "inter partes reexamination ." Those statutes granted third parties greater opportunities to participate in the Patent Office's reexamination proceedings as well as in any appeal of a Patent Office decision. See, e.g., American Inventors Protection Act of 1999, § 297 et seq. (2006 ed.) (superseded).
In 2011, Congress enacted the statute before us. That statute modifies "inter partes reexamination, " which it now calls "inter partes review ." See H.R.Rep. No. 112-98, pt. 1, pp. 46-47 (2011) (H.R. Rep.). Like inter partes reexamination, any third party can ask the agency to initiate inter partes review of a patent claim. But the new statute has changed the standard that governs the Patent Office's institution of the agency's process. Instead of requiring that a request for reexamination raise a "substantial new question of patentability," it now requires that a petition show "a reasonable likelihood that" the challenger "would prevail." Compare § 312(a) (2006 ed.) (repealed) with § 314(a) (2012 ed.).
The new statute provides a challenger with broader participation rights. It creates within the Patent Office a Patent Trial and Appeal Board (Board) composed of administrative patent judges, who are patent lawyers and former patent examiners, among others. § 6. That Board conducts the proceedings, reaches a conclusion, and sets forth its reasons. See ibid .
The statute sets forth time limits for completing this review. § 316(a)(11). It grants the Patent Office the authority to issue rules. § 316(a)(4). Like its predecessors, the statute authorizes judicial review of a "final written decision" canceling a patent claim. § 319. And, the statute says that the agency's initial decision "whether to institute an inter partes review" is "final and nonappealable." § 314(d) ; compare *2138 ibid. with §§ 312(a), (c) (2006 ed.) (repealed) (the "determination" that a petition for inter partes reexamination "raise[s]" "a substantial new question of patentability" is "final and non-appealable"), and § 303(c) (2012 ed.) (similar in respect to ex parte reexamination).
B
In 2002, Giuseppe A. Cuozzo applied for a patent covering a speedometer that will show a driver when he is driving above the speed limit. To understand the basic idea, think of the fact that a white speedometer needle will look red when it passes under a translucent piece of red glass or the equivalent (say, red cellophane). If you attach a piece of red glass or red cellophane to a speedometer beginning at 65 miles per hour, then, when the white needle passes that point, it will look red. If we attach the red glass to a plate that can itself rotate, if we attach the plate to the speedometer, if we connect the plate to a Global Positioning System (GPS) receiver, and if we enter onto a chip or a disk all the speed limits on all the Nation's roads, then the GPS can signal where the car is, the chip or disk can signal the speed limit at that place, and the plate can rotate to the right number on the speedometer. Thus, if the speed limit is 35 miles per hour, then the white speedometer needle will pass under the red plate at 35, not 65, and the driver will know if he is driving too fast.
In 2004, the Patent Office granted the patent. See U.S. Patent No. 6,778,074 (Cuozzo Patent). The Appendix contains excerpts from this patent, offering a less simplified (and more technical) description.
C
Petitioner Cuozzo Speed Technologies, LLC (Cuozzo), now holds the rights to the Cuozzo Patent. In 2012, Garmin International, Inc., and Garmin USA, Inc., filed a petition seeking inter partes review of the Cuozzo Patent's 20 claims. Garmin backed up its request by stating, for example, that the invention described in claim 17 was obvious in light of three prior patents, the Aumayer, Evans, and Wendt patents. U.S. Patent No. 6,633,811 ; U.S. Patent No. 3,980,041 ; and U.S. Patent No. 2,711,153. Cf. Goodyear Tire & Rubber Co. v. Ray-O-Vac Co., 321 U.S. 275, 280, 64 S.Ct. 593, 88 L.Ed. 721 (1944) (Black, J., dissenting) ("[S]omeone, somewhere, sometime, made th [is] discovery [but] I cannot agree that this patentee is that discoverer").
The Board agreed to reexamine claim 17, as well as claims 10 and 14. The Board recognized that Garmin had not expressly challenged claim 10 and claim 14 on the same obviousness ground. But, believing that "claim 17 depends on claim 14 which depends on claim 10," the Board reasoned that Garmin had "implicitly" challenged claims 10 and 14 on the basis of the same prior inventions, and it consequently decided to review all three claims together. App. to Pet. for Cert. 188a.
After proceedings before the Board, it concluded that claims 10, 14, and 17 of the Cuozzo Patent were obvious in light of the earlier patents to which Garmin had referred. The Board explained that the Aumayer patent "makes use of a GPS receiver to determine ... the applicable speed limit at that location for display," the Evans patent "describes a colored plate for indicating the speed limit," and the Wendt patent "describes us[ing] a rotatable pointer for indicating the applicable speed limit." Id., at 146a-147a. Anyone, the Board reasoned, who is "not an automaton"-anyone with "ordinary skill" and "ordinary creativity"-could have taken the automated approach suggested by the Aumayer patent and applied it to the manually adjustable signals described in the Evans *2139 and Wendt patents. Id., at 147a. The Board also concluded that Cuozzo's proposed amendments would not cure this defect, id., at 164a-166a, and it consequently denied Cuozzo's motion to amend its claims. Ultimately, it ordered claims 10, 14, and 17 of the Cuozzo Patent canceled, id., at 166a.
Cuozzo appealed to the United States Court of Appeals for the Federal Circuit. Cuozzo argued that the Patent Office improperly instituted inter partes review, at least in respect to claims 10 and 14, because the agency found that Garmin had only implicitly challenged those two claims on the basis of the Aumayer, Evans, and Wendt patents, while the statute required petitions to set forth the grounds for challenge "with particularity." § 312(a)(3). Cuozzo also argued that the Board, when construing the claims, improperly used the interpretive standard set forth in the Patent Office's regulation (i.e., it gave those claims their "broadest reasonable construction," 37 CFR § 42.100(b) ), when it should have applied the standard that courts normally use when judging a patent's validity (i.e., it should have given those claims their "ordinary meaning ... as understood by a person of skill in the art," Phillips v. AWH Corp., 415 F.3d 1303, 1314 (C.A.Fed.2005) (en banc)).
A divided panel of the Court of Appeals rejected both arguments. First, the panel majority pointed out that 35 U.S.C. § 314(d) made the decision to institute inter partes review "nonappealable." In re Cuozzo Speed Technologies, LLC, 793 F.3d 1268, 1273 (C.A.Fed.2015) (internal quotation marks omitted). Second, the panel majority affirmed the application of the broadest reasonable construction standard on the ground (among others) that the regulation was a reasonable, and hence lawful, exercise of the Patent Office's statutorily granted rulemaking authority. Id., at 1278-1279 ; see § 314(a)(4). By a vote of 6 to 5, the Court of Appeals denied Cuozzo's petition for rehearing en banc. In re Cuozzo Speed Technologies, LLC, 793 F.3d 1297, 1298 (C.A.Fed.2015).
We granted Cuozzo's petition for certiorari to review these two questions.
II
Like the Court of Appeals, we believe that Cuozzo's contention that the Patent Office unlawfully initiated its agency review is not appealable. For one thing, that is what § 314(d) says. It states that the "determination by the [Patent Office] whether to institute an inter partes review under this section shall be final and nonappealable. " (Emphasis added.)
For another, the legal dispute at issue is an ordinary dispute about the application of certain relevant patent statutes concerning the Patent Office's decision to institute inter partes review. Cuozzo points to a related statutory section, § 312, which says that petitions must be pleaded "with particularity." Those words, in its view, mean that the petition should have specifically said that claims 10 and 14 are also obvious in light of this same prior art. Garmin's petition, the Government replies, need not have mentioned claims 10 and 14 separately, for claims 10, 14, and 17 are all logically linked; the claims "rise and fall together," and a petition need not simply repeat the same argument expressly when it is so obviously implied. See 793 F.3d, at 1281. In our view, the "No Appeal" provision's language must, at the least, forbid an appeal that attacks a "determination ... whether to institute" review by raising this kind of legal question and little more. § 314(d).
Moreover, a contrary holding would undercut one important congressional objective, namely, giving the Patent Office significant *2140 power to revisit and revise earlier patent grants. See H.R. Rep., at 45, 48 (explaining that the statute seeks to "improve patent quality and restore confidence in the presumption of validity that comes with issued patents"); 157 Cong. Rec. 9778 (2011) (remarks of Rep. Goodlatte) (noting that inter partes review "screen[s] out bad patents while bolstering valid ones"). We doubt that Congress would have granted the Patent Office this authority, including, for example, the ability to continue proceedings even after the original petitioner settles and drops out, § 317(a), if it had thought that the agency's final decision could be unwound under some minor statutory technicality related to its preliminary decision to institute inter partes review.
Further, the existence of similar provisions in this, and related, patent statutes reinforces our conclusion. See § 319 (limiting appellate review to the "final written decision"); § 312(c) (2006 ed.) (repealed) (the "determination" that a petition for inter partes reexamination "raise[s]" a "substantial new question of patentability" is "final and non-appealable"); see also § 303(c) (2012 ed.); In re Hiniker Co., 150 F.3d 1362, 1367 (C.A.Fed.1998) ("Section 303 ... is directed toward the [Patent Office's] authority to institute a reexamination, and there is no provision granting us direct review of that decision").
The dissent, like the panel dissent in the Court of Appeals, would limit the scope of the "No Appeal" provision to interlocutory appeals, leaving a court free to review the initial decision to institute review in the context of the agency's final decision. Post, at 2148 - 2149, 2150 - 2151 (ALITO, J., concurring in part and dissenting in part); 793 F.3d, at 1291 (Newman, J., dissenting). We cannot accept this interpretation. It reads into the provision a limitation (to interlocutory decisions) that the language nowhere mentions and that is unnecessary. The Administrative Procedure Act already limits review to final agency decisions. 5 U.S.C. § 704. The Patent Office's decision to initiate inter partes review is "preliminary," not "final." Ibid . And the agency's decision to deny a petition is a matter committed to the Patent Office's discretion. See § 701(a)(2); 35 U.S.C. § 314(a) (no mandate to institute review); see also post, at 2153, and n. 6. So, read as limited to such preliminary and discretionary decisions, the "No Appeal" provision would seem superfluous. The dissent also suggests that its approach is a "familiar practice," consistent with other areas of law. Post, at 2152. But the kind of initial determination at issue here-that there is a "reasonable likelihood" that the claims are unpatentable on the grounds asserted-is akin to decisions which, in other contexts, we have held to be unreviewable. See Kaley v. United States, 571 U.S. ----, ----, 134 S.Ct. 1090, 1097-1098, 188 L.Ed.2d 46 (2014) ("The grand jury gets to say-without any review, oversight, or second-guessing-whether probable cause exists to think that a person committed a crime").
We recognize the "strong presumption" in favor of judicial review that we apply when we interpret statutes, including statutes that may limit or preclude review. Mach Mining, LLC v. EEOC, 575 U.S. ----, ----, 135 S.Ct. 1645, 1650-1651, 191 L.Ed.2d 607 (2015) (internal quotation marks omitted). This presumption, however, may be overcome by " 'clear and convincing' " indications, drawn from "specific language," "specific legislative history," and "inferences of intent drawn from the statutory scheme as a whole," that Congress intended to bar review. Block v. Community Nutrition Institute, 467 U.S. 340, 349-350, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984). That standard *2141 is met here. The dissent disagrees, and it points to Lindahl v. Office of Personnel Management, 470 U.S. 768, 105 S.Ct. 1620, 84 L.Ed.2d 674 (1985), to support its view that, in light of this presumption, § 314(d) should be read to permit judicial review of any issue bearing on the Patent Office's preliminary decision to institute inter partes review. See post, at 2150 - 2151. Lindahl is a case about the judicial review of disability determinations for federal employees. We explained that a statute directing the Office of Personnel Management to " 'determine questions of disability,' " and making those decisions " 'final,' " " 'conclusive,' " and " 'not subject to review,' " barred a court from revisiting the "factual underpinnings of ... disability determinations"-though it permitted courts to consider claims alleging, for example, that the Office of Personnel Management " 'substantial[ly] depart[ed] from important procedural rights.' " 470 U.S., at 771, 791, 105 S.Ct. 1620. Thus, Lindahl 's interpretation of that statute preserved the agency's primacy over its core statutory function in accord with Congress' intent. Our interpretation of the "No Appeal" provision here has the same effect. Congress has told the Patent Office to determine whether inter partes review should proceed, and it has made the agency's decision "final" and "nonappealable." § 314(d). Our conclusion that courts may not revisit this initial determination gives effect to this statutory command. Moreover, Lindahl 's conclusion was consistent with prior judicial practice in respect to those factual agency determinations, and legislative history "strongly suggest[ed]" that Congress intended to preserve this prior practice. Id., at 780, 105 S.Ct. 1620. These features, as explained above, also support our interpretation: The text of the "No Appeal" provision, along with its place in the overall statutory scheme, its role alongside the Administrative Procedure Act, the prior interpretation of similar patent statutes, and Congress' purpose in crafting inter partes review, all point in favor of precluding review of the Patent Office's institution decisions.
Nevertheless, in light of § 314(d)'s own text and the presumption favoring review, we emphasize that our interpretation applies where the grounds for attacking the decision to institute inter partes review consist of questions that are closely tied to the application and interpretation of statutes related to the Patent Office's decision to initiate inter partes review. See § 314(d) (barring appeals of "determinations ... to initiate an inter partes review under this section " (emphasis added)). This means that we need not, and do not, decide the precise effect of § 314(d) on appeals that implicate constitutional questions, that depend on other less closely related statutes, or that present other questions of interpretation that reach, in terms of scope and impact, well beyond "this section." Cf. Johnson v. Robison, 415 U.S. 361, 367, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974) (statute precluding review of "any question of law or fact under any law administered by the Veterans' Administration" does not bar review of constitutional challenges (emphasis deleted and internal quotation marks omitted)); Traynor v. Turnage, 485 U.S. 535, 544-545, 108 S.Ct. 1372, 99 L.Ed.2d 618 (1988) (that same statute does not bar review of decisions made under different statutes enacted at other times). Thus, contrary to the dissent's suggestion, we do not categorically preclude review of a final decision where a petition fails to give "sufficient notice" such that there is a due process problem with the entire proceeding, nor does our interpretation enable the agency to act outside its statutory limits by, for example, canceling a patent claim for "indefiniteness *2142 under § 112" in inter partes review. Post, at 2153 - 2155. Such "shenanigans" may be properly reviewable in the context of § 319 and under the Administrative Procedure Act, which enables reviewing courts to "set aside agency action" that is "contrary to constitutional right," "in excess of statutory jurisdiction," or "arbitrary [and] capricious." Compare post, at 2155, with 5 U.S.C. §§ 706(2)(A)-(D).
By contrast, where a patent holder merely challenges the Patent Office's "determin[ation] that the information presented in the petition ... shows that there is a reasonable likelihood" of success "with respect to at least 1 of the claims challenged," § 314(a), or where a patent holder grounds its claim in a statute closely related to that decision to institute inter partes review, § 314(d) bars judicial review. In this case, Cuozzo's claim that Garmin's petition was not pleaded "with particularity" under § 312 is little more than a challenge to the Patent Office's conclusion, under § 314(a), that the "information presented in the petition" warranted review. Cf. United States v. Williams, 504 U.S. 36, 54, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992) ("A complaint about the quality or adequacy of the evidence can always be recast as a complaint that the ... presentation was 'incomplete' or 'misleading' "). We therefore conclude that § 314(d) bars Cuozzo's efforts to attack the Patent Office's determination to institute inter partes review in this case.
III
Cuozzo further argues that the Patent Office lacked the legal authority to issue its regulation requiring the agency, when conducting an inter partes review, to give a patent claim "its broadest reasonable construction in light of the specification of the patent in which it appears." 37 CFR § 42.100(b). Instead, Cuozzo contends that the Patent Office should, like the courts, give claims their "ordinary meaning ... as understood by a person of skill in the art." Phillips, 415 F.3d, at 1314.
The statute, however, contains a provision that grants the Patent Office authority to issue "regulations ... establishing and governing inter partes review under this chapter." 35 U.S.C. § 316(a)(4). The Court of Appeals held that this statute gives the Patent Office the legal authority to issue its broadest reasonable construction regulation. We agree.
A
We interpret Congress' grant of rulemaking authority in light of our decision in Chevron, U.S.A. Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694. Where a statute is clear, the agency must follow the statute. Id., at 842-843, 104 S.Ct. 2778. But where a statute leaves a "gap" or is "ambigu [ous]," we typically interpret it as granting the agency leeway to enact rules that are reasonable in light of the text, nature, and purpose of the statute. Mead Corp., 533 U.S., at 229, 121 S.Ct. 2164 ; Chevron, U.S.A. Inc., supra, at 843, 104 S.Ct. 2778. The statute contains such a gap: No statutory provision unambiguously directs the agency to use one standard or the other. And the statute "express[ly] ... authoriz[es] [the Patent Office] to engage in the process of rulemaking" to address that gap. Mead Corp., supra, at 229, 121 S.Ct. 2164. Indeed, the statute allows the Patent Office to issue rules "governing inter partes review," § 316(a)(4), and the broadest reasonable construction regulation is a rule that governs inter partes review.
Both the dissenting judges in the Court of Appeals and Cuozzo believe that other ordinary tools of statutory interpretation, *2143 INS v. Cardoza-Fonseca, 480 U.S. 421, 432, and n. 12, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987), lead to a different conclusion. The dissenters, for example, point to cases in which the Circuit interpreted a grant of rulemaking authority in a different statute, § 2(b)(2)(A), as limited to procedural rules. See, e.g., Cooper Technologies Co. v. Dudas, 536 F.3d 1330, 1335 (C.A.Fed.2008). These cases, however, as we just said, interpret a different statute. That statute does not clearly contain the Circuit's claimed limitation, nor is its language the same as that of § 316(a)(4). Section 2(b)(2)(A) grants the Patent Office authority to issue "regulations" "which ... shall govern ... proceedings in the Office " (emphasis added), but the statute before us, § 316(a)(4), does not refer to "proceedings"-it refers more broadly to regulations "establishing and governing inter partes review." The Circuit's prior interpretation of § 2(b)(2)(A) cannot magically render unambiguous the different language in the different statute before us.
Cuozzo and its supporting amici believe we will reach a different conclusion if we carefully examine the purpose of inter partes review. That purpose, in their view, is to modify the previous reexamination procedures and to replace them with a " 'trial, adjudicatory in nature.' " Brief for Petitioner 26 (quoting Google Inc. v. Jongerius Panoramic Techs., LLC, IPR 2013-00191, Paper No. 50, p. 4 (PTAB, Feb. 13, 2014)). They point out that, under the statute, an opposing party can trigger inter partes review. Parties can engage in "discovery of relevant evidence," including "deposition[s], ... affidavits or declarations" as well as anything "otherwise necessary in the interest of justice." § 316(a)(5). Parties may present "factual evidence and expert opinions" to support their arguments. § 316(a)(8). The challenger bears the burden of proving unpatentability. § 318(e). And, after oral argument before a panel of three of the Board's administrative patent judges, it issues a final written decision. §§ 6, 316(a)(10), 318. Perhaps most importantly, a decision to cancel a patent normally has the same effect as a district court's determination of a patent's invalidity.
In light of these adjudicatory characteristics, which make these agency proceedings similar to court proceedings, Congress, in Cuozzo's view, must have designed inter partes review as a "surrogate for court proceedings." Brief for Petitioner 28. Cuozzo points to various sources of legislative history in support of its argument. See H.R. Rep., at 48 (Inter partes review is a "quick and cost effective alternativ[e] to litigation"); id., at 46-47 ("The Act converts inter partes reexamination from an examinational to an adjudicative proceeding"); see also S.Rep. No. 110-259, p. 20 (2008) (Inter partes review is "a quick, inexpensive, and reliable alternative to district court litigation"); 157 Cong. Rec. 3429-3430 (2011) (remarks of Sen. Kyl) ("Among the reforms that are expected to expedite these proceedings [is] the shift from an examinational to an adjudicative model"). And, if Congress intended to create a "surrogate" for court proceedings, why would Congress not also have intended the agency to use the claim construction standard that district courts apply (namely, the ordinary meaning standard), rather than the claim construction standard that patent examiners apply (namely, the broadest reasonable construction standard)?
The problem with Cuozzo's argument, however, is that, in other significant respects, inter partes review is less like a judicial proceeding and more like a specialized agency proceeding. Parties that initiate the proceeding need not have a concrete stake in the outcome; indeed, they *2144 may lack constitutional standing. See § 311(a) ; cf. Consumer Watchdog v. Wisconsin Alumni Research Foundation, 753 F.3d 1258, 1261-1262 (C.A.Fed.2014). As explained above, challengers need not remain in the proceeding; rather, the Patent Office may continue to conduct an inter partes review even after the adverse party has settled. § 317(a). Moreover, as is the case here, the Patent Office may intervene in a later judicial proceeding to defend its decision-even if the private challengers drop out. And the burden of proof in inter partes review is different than in the district courts: In inter partes review, the challenger (or the Patent Office) must establish unpatentability "by a preponderance of the evidence"; in district court, a challenger must prove invalidity by "clear and convincing evidence." Compare § 316(e) with Microsoft Corp. v. i4i Ltd. Partnership, 564 U.S. 91, 95, 131 S.Ct. 2238, 180 L.Ed.2d 131 (2011).
Most importantly, these features, as well as inter partes review's predecessors, indicate that the purpose of the proceeding is not quite the same as the purpose of district court litigation. The proceeding involves what used to be called a reexamination (and, as noted above, a cousin of inter partes review, ex parte reexamination, 35 U.S.C. § 302 et seq., still bears that name). The name and accompanying procedures suggest that the proceeding offers a second look at an earlier administrative grant of a patent. Although Congress changed the name from "reexamination" to "review," nothing convinces us that, in doing so, Congress wanted to change its basic purposes, namely, to reexamine an earlier agency decision. Thus, in addition to helping resolve concrete patent-related disputes among parties, inter partes review helps protect the public's "paramount interest in seeing that patent monopolies ... are kept within their legitimate scope." Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 816, 65 S.Ct. 993, 89 L.Ed. 1381 (1945) ; see H.R. Rep., at 39-40 (Inter partes review is an "efficient system for challenging patents that should not have issued").
Finally, neither the statutory language, its purpose, or its history suggest that Congress considered what standard the agency should apply when reviewing a patent claim in inter partes review. Cuozzo contends that § 301(d), explaining that the Patent Office should "determine the proper meaning of a patent claim," reinforces its conclusion that the ordinary meaning standard should apply. But viewed against a background of language and practices indicating that Congress designed a hybrid proceeding, § 301(d)'s reference to the "proper meaning" of a claim is ambiguous. It leaves open the question of which claim construction standard is "proper."
The upshot is, whether we look at statutory language alone, or that language in context of the statute's purpose, we find an express delegation of rulemaking authority, a "gap" that rules might fill, and "ambiguity" in respect to the boundaries of that gap. Mead Corp., 533 U.S., at 229, 121 S.Ct. 2164 ; see Chevron U.S.A. Inc., 467 U.S., at 843, 104 S.Ct. 2778. We consequently turn to the question whether the Patent Office's regulation is a reasonable exercise of its rulemaking authority.
B
We conclude that the regulation represents a reasonable exercise of the rulemaking authority that Congress delegated to the Patent Office. For one thing, construing a patent claim according to its broadest reasonable construction helps to protect the public. A reasonable, yet unlawfully *2145 broad claim might discourage the use of the invention by a member of the public. Because an examiner's (or reexaminer's) use of the broadest reasonable construction standard increases the possibility that the examiner will find the claim too broad (and deny it), use of that standard encourages the applicant to draft narrowly. This helps ensure precision while avoiding overly broad claims, and thereby helps prevent a patent from tying up too much knowledge, while helping members of the public draw useful information from the disclosed invention and better understand the lawful limits of the claim. See § 112(a) ; Nautilus, Inc. v. Biosig Instruments, Inc., 572 U.S. ----, ----, 134 S.Ct. 2120, 2129, 189 L.Ed.2d 37 (2014) ; see also In re Yamamoto, 740 F.2d 1569, 1571 (C.A.Fed.1984).
For another, past practice supports the Patent Office's regulation. See 77 Fed.Reg. 48697 (2012). The Patent Office has used this standard for more than 100 years. 793 F.3d, at 1276. It has applied that standard in proceedings, which, as here, resemble district court litigation. See Bamberger v. Cheruvu, 55 U.S.P.Q.2d 1523, 1527 (BPAI 1998) (broadest reasonable construction standard applies in interference proceedings); Brief for Generic Pharmaceutical Association et al. as Amici Curiae 7-16 (describing similarities between interference proceedings and adjudicatory aspects of inter partes review); see also In re Yamamoto, supra, at 1571 (broadest reasonable construction standard applies in reexamination). It also applies that standard in proceedings that may be consolidated with a concurrent inter partes review. See 77 Fed.Reg. 48697-48698.
Cuozzo makes two arguments in response. First, Cuozzo says that there is a critical difference between the Patent Office's initial examination of an application to determine if a patent should issue, and this proceeding, in which the agency reviews an already-issued patent. In an initial examination of an application for a patent the examiner gives the claim its broadest reasonable construction. But if the patent examiner rejects the claim, then, as described above, Part I-A, supra, the applicant has a right to amend and resubmit the claim. And the examiner and applicant may repeat this process at least once more. This system-broad construction with a chance to amend-both protects the public from overly broad claims and gives the applicant a fair chance to draft a precise claim that will qualify for patent protection. In inter partes review, however, the broadest reasonable construction standard may help protect certain public interests, but there is no absolute right to amend any challenged patent claims. This, Cuozzo says, is unfair to the patent holder.
The process however, is not as unfair as Cuozzo suggests. The patent holder may, at least once in the process, make a motion to do just what he would do in the examination process, namely, amend or narrow the claim. § 316(d) (2012 ed.). This opportunity to amend, together with the fact that the original application process may have presented several additional opportunities to amend the patent, means that use of the broadest reasonable construction standard is, as a general matter, not unfair to the patent holder in any obvious way.
Cuozzo adds that, as of June 30, 2015, only 5 out of 86 motions to amend have been granted. Brief for Petitioner 30; see Tr. of Oral Arg. 30 (noting that a sixth motion had been granted by the time of oral argument in this case). But these numbers may reflect the fact that no amendment could save the inventions at issue, i.e., that the patent should have never issued at all.
*2146 To the extent Cuozzo's statistical argument takes aim at the manner in which the Patent Office has exercised its authority, that question is not before us. Indeed, in this particular case, the agency determined that Cuozzo's proposed amendment "enlarge[d]," rather than narrowed, the challenged claims. App. to Pet. for Cert. 165a-166a; see § 316(d)(3). Cuozzo does not contend that the decision not to allow its amendment is "arbitrary" or "capricious," or "otherwise [un]lawful." 5 U.S.C. § 706(2)(a).
Second, Cuozzo says that the use of the broadest reasonable construction standard in inter partes review, together with use of an ordinary meaning standard in district court, may produce inconsistent results and cause added confusion. A district court may find a patent claim to be valid, and the agency may later cancel that claim in its own review. We recognize that that is so. This possibility, however, has long been present in our patent system, which provides different tracks-one in the Patent Office and one in the courts-for the review and adjudication of patent claims. As we have explained above, inter partes review imposes a different burden of proof on the challenger. These different evidentiary burdens mean that the possibility of inconsistent results is inherent to Congress' regulatory design. Cf. One Lot Emerald Cut Stones v. United States, 409 U.S. 232, 235-238, 93 S.Ct. 489, 34 L.Ed.2d 438 (1972) (per curiam ).
Moreover, the Patent Office uses the broadest reasonable construction standard in other proceedings, including interference proceedings (described above), which may implicate patents that are later reviewed in district court. The statute gives the Patent Office the power to consolidate these other proceedings with inter partes review. To try to create uniformity of standards would consequently prove difficult. And we cannot find unreasonable the Patent Office's decision to prefer a degree of inconsistency in the standards used between the courts and the agency, rather than among agency proceedings. See 77 Fed.Reg. 48697-48698.
Finally, Cuozzo and its supporting amici offer various policy arguments in favor of the ordinary meaning standard. The Patent Office is legally free to accept or reject such policy arguments on the basis of its own reasoned analysis. Having concluded that the Patent Office's regulation, selecting the broadest reasonable construction standard, is reasonable in light of the rationales described above, we do not decide whether there is a better alternative as a policy matter. That is a question that Congress left to the particular expertise of the Patent Office.
* * *
For the reasons set forth above, we affirm the judgment of the Court of Appeals for the Federal Circuit.
It is so ordered.
APPENDIX
SPEED LIMIT INDICATOR AND METHOD FOR DISPLAYING SPEED AND THE RELEVANT SPEED LIMIT
*2147 * * *
DESCRIPTION OF THE CURRENT EMBODIMENT
"In FIG. 1 , a new and improved speed limit indicator and method for displaying speed and the relevant speed limit 10 ... is illustrated.... More particularly, the speed limit indicator and method for displaying speed and the relevant speed limit 10 has a speedometer 12 mounted on a dashboard 26 . [The] [s]peedometer 12 has a backplate 14 made of plastic, speed denoting markings 16 painted on [that] backplate 14 , a colored display 18 made of a red plastic filter, and a plastic needle 20 rotably mounted in the center of [the] backplate 14 . A [GPS] receiver 22 is positioned adjacent to the speedometer 12 . Other gauges 24 typically present on a dashboard 26 are shown.
.....
"[I]n FIG. 4 , a new and improved speed limit indicator and method for displaying speed and the relevant speed limit 10 ...
*2148 is illustrated.... More particularly, the speed limit indicator and method for displaying speed and the relevant speed limit 10 has a backplate 14 , colored display 18 , housing 28 , and axle 30 .
.....
"I claim:
.....
"10 . A speed limit indicator comprising:
"a [GPS] receiver;
"a display controller connected to said [GPS] receiver, wherein said display controller adjusts a colored display in response to signals from said [GPS] receiver to continuously update the delineation of which speed readings are in violation of the speed limit at a vehicle's present location; and
"a speedometer integrally attached to said colored display.
.....
"14 . The speed limit indicator as defined in claim 10 , wherein said colored display is a colored filter.
.....
"17 . The speed limit indicator as defined in claim 14 , wherein said display controller rotates said colored filter independently of said speedometer to continuously update the delineation of which speed readings are in violation of the speed limit at a vehicles present location." Cuozzo Patent.