NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**INTERTAINER, INC.,**
*Appellant*

**v.**

**HULU, LLC,**
*Appellee*

---

2015-2065

---

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in No. CBM2014-00052.

---

Decided: September 26, 2016

---

DIRK D. THOMAS, McKool Smith, P.C., Washington, DC, argued for appellant. Also represented by JOEL LANCE THOLLANDER, Austin, TX.

ELIOT DAMON WILLIAMS, Baker Botts LLP, Palo Alto, CA, argued for appellee. Also represented by HARPER BATTS.

---

Before PROST, *Chief Judge*, CHEN and STOLL, *Circuit Judges*.

PROST, *Chief Judge*.

Intertainer, Inc. ("Intertainer") appeals from the Patent Trial and Appeal Board's ("Board") Final Written Decision in a covered business method ("CBM") review finding that U.S. Patent No. 8,479,246 ("'246 patent") is anticipated under 35 U.S.C. § 102. For the reasons stated below, we affirm.

## BACKGROUND

Intertainer owns the '246 patent, which was filed on June 13, 2012 and is titled "System and Method for Interactive Video Content Programming." The '246 patent relates to creating and distributing videos with clickable links. '246 patent col. 1 l. 58–col. 2 l. 15. When a user clicks on a link, the video is paused and the user is directed to a web page with "ancillary content." *Id.* at col. 2 ll. 8–10, col. 6 l. 61–col. 7 l. 2, col. 8 ll. 4–10, col. 9 ll. 27–30. After the user is done viewing the "ancillary content," the user can click on a link to return to the original video and resume play. *Id.* at col. 7 ll. 22–26, col. 8 ll. 48–50. Figure 5 of the '246 patent provides an example that illustrates this process:



FIG. 5

To make the videos clickable, links must be "programmed" such that they are coordinated with the video itself. *Id.* at col. 5 ll. 23–26 (explaining that "interface links are programmed according to the intended method of presentation and associated with a piece of video content"). For example, links may be embedded in the video such that the video and links are streamed over the internet as a whole. *Id.* at col. 5 ll. 27–30. Alternatively,

links may be delivered as a separate stream and overlaid on top of the video. *Id.* at col. 5 l. 63–col. 6 l. 4.

In addition, all of the asserted claims recite the use of a "link program" that helps manage the interplay between the video and the links. The specification provides no information about how the "link program" is programmed. It does, however, disclose that the "interface link program" can be delivered over a network, and that "delivery of the interface link program need not be simultaneously delivered with the video to the user since the interface link program would already be at the user's visual display." *Id.* at col. 6 ll. 24–27.

Independent claim 1 and dependent claims 2, 3, 5, 8, 10, 11, and 13–15 ("the challenged claims") are at issue.[1] Claim 1 is representative:

> 1. A method for creating an interactive video, the method comprising:
>
> encoding and storing the video onto a remote storage medium at a first site;
>
> creating a *link program* adapted to both:
>
> *(a) interrupt streaming of the video at the remote storage medium to prevent streaming of the video over an Internet Protocol (IP)-based network to a second site; and*
>
> *(b) access ancillary content accessible over the network with a universal resource locator (URL) to a remote site where the ancillary content is stored, the link program linking the ancillary content and the video to a point in time when the streaming of*

---

[1]    These are the only remaining claims in the '246 patent. Intertainer has filed a statutory disclaimer under 37 U.S.C. § 1.321(a) disclaiming all others.

> *the video from the remote storage medium is inter-rupted;*
>
> *associating the link program with the video;*
>
> streaming the video over the network for display;
>
> *providing the link program over the network;*
>
> receiving an indication of an interaction with the link program;
>
> interrupting, at the first site, the streaming of the video in response to receiving the indication of the interaction with the link program; and
>
> continuing the streaming of the video over the network from the point in time when the stream-ing of the video was interrupted.

*Id.* at col. 9 l. 45–col. 10 l. 3 (emphases added).

On December 20, 2013, Hulu filed a petition with the Board seeking CBM review of the '246 patent. The Board instituted review of the '246 patent, in part, on the ground of anticipation in view of EP 0 840 241 to Chen ("Chen"). In its Institution Decision, the Board construed the claim term "link program" as "a set of instructions that tells the computer what to do when a link is selected." J.A. 122. In its Patent Owner Response, Intertainer did not explic-itly challenge this construction, but instead argued direct-ly that Chen did not disclose a "link program" because it did not disclose a single program that both (1) interrupted the streaming video and (2) accessed ancillary content.

On June 12, 2015, the Board issued a Final Written Decision finding that the challenged claims of the '246 patent were anticipated by Chen. It reaffirmed its con-struction and clarified that, under its construction, the "link program" did not need to be limited to a *single* program. It then concluded that Chen anticipated the '246 patent because, in relevant part, "Chen's disclosure

of pausing the video and displaying the linked page on the computer, in response to clicking a hot-link" disclosed the "creating a link program adapted to both: (a) interrupt streaming of the video at the remote storage medium . . . and (b) access ancillary content . . ." limitation.  J.A. 12. It also construed the terms "associating the link program with the video" and "providing the link program over the network" as not requiring that the *entire* link program be "provid[ed]" with the video or "associat[ed]" over the network and concluded that Chen disclosed these limitations.  J.A. 9-10, 15-16.

Intertainer appeals from the Board's decision.  We have jurisdiction under 28 U.S.C. § 1295(a)(4)(A).

## DISCUSSION

We review the Board's legal conclusions de novo and its findings of fact for substantial evidence.  *In re Gartside*, 203 F.3d 1305, 1316 (Fed. Cir. 2000).  We review the Board's claim construction under the standard set forth in *Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015).

In this appeal, Intertainer challenges the Board's construction of three claim terms: (1) "link program," (2) "associating the link program with the video," and (3) "providing the link program over the network."  We address each in turn.

## I

First, Intertainer argues that the Board erred in construing "link program" because its construction does not require that a "single" "program" perform both functions of "interrupt[ing] streaming of the video at the remote storage medium . . ." and "access[ing] ancillary content accessible over the network . . . ."  Hulu counters that Intertainer waived its ability to challenge the Board's construction, and that in any event the Board's construction is correct.

A

Waiver is a doctrine that is limited in application. *Interactive Gift Exp., Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1346 (Fed. Cir. 2001). In the context of claim construction, "the doctrine has been applied to preclude a party from adopting a new claim construction position on appeal." *Id.* However, waiver "has not been invoked . . . to prevent a party from clarifying or defending the original scope of its claim construction, or from supporting its existing claim construction position with new citations to the specification." *Id.*

Hulu contends that Intertainer waived its ability to challenge the Board's construction because its Patent Owner Response neither explicitly challenged the Board's construction of "link program," nor proposed an alternate construction. Intertainer does not disagree with these facts but argues that it preserved its challenge because it asserts the same position that it took in its Patent Owner Response.

We agree with Intertainer. Although Intertainer did not explicitly challenge the Board's construction of "link program" in its Patent Owner Response (indeed, it appears to cite to it approvingly, *see* J.A. 147), it took the same position that it raises on appeal: that the claims require that the "link program" is a single program that performs both "interrupt[ing] . . ." and "access[ing] . . ." functions. *See* J.A. 150–52. The only difference is that, before the Board, Intertainer did not integrate this position into a proposed construction of "link program;" instead, it argued that the plain language of the claims required this interpretation, drawing a distinction from Chen. *Id.* In effect, the locus of the dispute has shifted, but the dispute itself has not. This shift is understandable, as it was not until the Final Written Decision that the Board clarified that its construction of "link program" ("a set of instructions that tells the computer what to do

when a link is selected," J.A. 122) did not require the "interrupt[ing] . . ." and "access[ing] . . ." functions to be embodied in the same program. Accordingly, because its arguments are consistent with the original scope of Intertainer's claim construction position, Intertainer has not waived its ability to challenge the Board's construction. *See Interactive Gift*, 256 F.3d at 1346.

B

Turning to the merits, in a CBM review claims are given their "broadest reasonable construction in light of the specification of the patent in which [they] appear[]." 37 C.F.R. § 42.300(b); *see also Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2142–45 (2016). "The protocol of giving claims their broadest reasonable interpretation . . . does not include giving claims a legally incorrect interpretation." *Microsoft Corp. v. Proxyconn, Inc.*, 789 F.3d 1292, 1298 (Fed. Cir. 2015) (quoting *In re Skvorecz*, 580 F.3d 1262, 1267 (Fed. Cir. 2009)). Accordingly, the Board's construction "cannot be divorced from the specification and the record evidence and must be consistent with the one that those skilled in the art would reach." *Id.* (internal quotation marks omitted). In addition, "[t]he [Board] should also consult the patent's prosecution history in proceedings in which the patent has been brought back to the agency for a second review." *Id.*

Intertainer argues that the Board's construction of "link program," as clarified in its Final Written Decision, is incorrect because it does not require that the "interrupt[ing] . . ." and "access[ing] . . ." functions be performed by a "single" "program." Its primary argument rests on the language of the claims: according to Intertainer, the claims recite that the "link program" is "adapted to both" functions, so it should be construed to be a single program whose corpus of instructions fully executes both functions. In technical terms, Intertainer argues that the "link program" must be "a single compilation of instructions"

such that the main program and all sub-routines accessible to it (i.e., present at compile-time) are sufficient to accomplish both "interrupt[ing] . . ." and "access[ing] . . ." functions. Opening Br. 30 & n.2; *see also* Oral Argument at 2:35–3:38, *available at* http://oralarguments.cafc.uscourts.gov/default.aspx?fl=2015-2065.mp3.

Hulu counters that Intertainer reads the claims too narrowly. According to Hulu, the claims and the specification only describe "link program" in functional terms and are silent as to whether the "interrupt[ing] . . ." and "access[ing] . . ." functions must be structured as one "link program" or several. Hulu also argues that only this position is consistent with the prosecution history because arguments that Intertainer made to overcome written description and anticipation rejections require that "link program" be broad enough to cover *any* computer implementation (i.e., one program or several) of the claimed functions.

The parties' dispute here rests not with what a link program *does*, but what a link program *is*; specifically, whether the "interrupt[ing] . . ." and "access[ing] . . ." functions require a single "link program." On this narrower question, we agree with Hulu that the claims, given their broadest reasonable interpretation in light of the specification and prosecution history, impose no such requirement.

First, the claim language is silent on this question. The claims require that "a link program" is "adapted to" "interrupt[ing] . . ." and "access[ing] . . ." functions, but impose no limits on how these two functions must be programmed. The step of "creating a link program" could involve creating two separate executables that are invoked serially, or a single executable that only need be called once. It could also involve creating a single executable with multiple parameters such that the executable can be invoked once with one set of arguments to perform

the "interrupt[ing] . . ." function and invoked a second time with another set of arguments to perform the "access[ing] . . ." function. Further, the claims only require that the "link program" be "adapted to" perform these functions, so it could also be programmed such that it only helps initiate these functions, as opposed to performing these functions itself.

The specification also imposes no restriction on how a "link program" must be structured, as it describes the "interrupt[ing] . . ." and "access[ing] . . ." operations in only functional terms. *See, e.g.*, '246 patent col. 2 ll. 32–37, col. 7 ll. 1–12, col. 8 ll. 8–11, 37–50, col. 9 ll. 27–36. In fact, its sole discussion of the "interface link program" appears in a single paragraph and is primarily concerned with how the program can be delivered to a client computer. *See id.* at col. 6 ll. 21–32. There is no discussion of how a "link program" should be programmed.

Finally, the prosecution history confirms that the "link program" cannot be limited to certain programmatic implementations. During prosecution, the examiner rejected claims reciting "link program" for lack of written description under 35 U.S.C. § 112, ¶ 1, in part because she believed the specification only disclosed delivering a stream of links over a network, as opposed to an entire "link program." J.A. 409. According to the examiner, this was insufficient written description support for the "providing the link program over the network" limitation. *Id.* To overcome this rejection, Intertainer argued that the specification did in fact disclose delivery of an entire "link program" because disclosure of "link program" functionality meant that an entire "link program" was necessarily present:

> [T]he fact that the computer performs the disclosed functions when a user interacts with an interface link necessarily requires that there is a link program instructing the computer to perform

those functions. As such, one having ordinary skill in the art would appreciate that the claimed 'link program' is merely the list of instructions that perform the disclosed functions.

J.A. 339.

In addition, the examiner also rejected the claims as anticipated under § 102 by U.S. Patent No. 7,139,813 to Wallenius ("Wallenius"). J.A. 408. Intertainer attempted to swear behind Wallenius by claiming priority to a "GAP Demo" embodiment which it had previously released,[2] but the examiner rejected this attempt because she believed that the "GAP Demo" also only delivered a stream of links over a network, not an entire "link program." To overcome this rejection, Intertainer repeated this same rationale:

[T]he fact that the computer performs the disclosed functions when a user interacts with an interface link necessarily requires that there is a link program instructing the computer to perform those functions. As such, one having ordinary skill in the art would appreciate that the claimed 'link program' is merely the list of instructions that perform the disclosed functions.

J.A. 349–50.

In both contexts, Intertainer's argument to the examiner advances a conception of "link program" that is broad enough to cover any implementation (i.e., one program or

---

[2] The "GAP Demo" was an interactive video showing dancers wearing GAP clothing. J.A. 609. A user could click on certain clothing items, such as a pair of khaki pants that a dancer was wearing, and be directed to a web page with details and purchasing information. J.A. 609–10.

several). This is because it assumes that, as long as there is a computer performing the "link program" functions (i.e., "interrupt[ing] . . ." and "access[ing] . . ."), a "link program" exists. Indeed, had the examiner operated under a narrower construction of "link program" that required a certain programmatic structure (i.e., one executable program), it is unclear whether Intertainer would have been able to overcome the § 112 and § 102 rejections because the specification does not disclose details about how the "link program" is structured and the § 1.131 declarations that Intertainer submitted on its "GAP Demo" do not identify a "link program" that is a single executable.[3] Accordingly, prosecution proceeded based on a structure-independent interpretation of "link program" and the Board correctly concluded that its broadest reasonable interpretation must be at least as broad.

For these reasons, the Board did not err in construing "link program" to not require that the "interrupt[ing] . . ." and "access[ing]. . ." functions be performed by a "single" "program."

## II

Intertainer also challenges the Board's construction of the terms "associating the link program with the video" and "providing the link program over the network." The

---

[3]    Instead, the GAP Demo relied on a library of remote methods to deliver compressed streams of hyperlinked video to devices running PersonalJava. J.A. 350, 612–15, 643–48, 651–52, 692. Intertainer identified a remote method that initiated a command to interrupt streaming from Intertainer's remote databases as performing the "interrupt[ing] . . ." step and a separate (but unspecified) command to access a URL as performing the "access[ing] . . ." step. J.A. 614–15.

Board did not construe these terms in its Institution Decision, *see* J.A. 7–9, but clarified in its Final Written Decision that neither of these phrases requires that the *entire* link program be provided over the network or associated with the video, J.A. 9–10. Instead, in its view, providing and associating a stream of links was sufficient. J.A. 15–16.

On appeal, Intertainer argues that the Board's constructions contradict the plain language of the claims, which require that "the link program" is "provid[ed]" and "associat[ed]." It also presses that the specification and the prosecution history are consistent with this position because the specification never discloses "providing" or "associating" only part of the "link program," and that arguments that it made during prosecution are consistent with interpreting the "link program" as a single, multi-element program.

Hulu counters that Intertainer's position runs afoul of the prosecution history because, in order to overcome written description and anticipation rejections, it relied on interpretations of these limitations that only "provid[ed]" and "associate[ed]" interface links, not an entire link program.

We agree with Hulu. As discussed above, during prosecution, the examiner rejected Intertainer's claims for lack of written description because she believed the specification did not disclose "providing the link program over the network." J.A. 409. Intertainer disagreed and argued that, because the specification disclosed providing a stream of links over the network and associating the links with video content, it necessarily disclosed the "providing" and "associating" steps. J.A. 339 ("[I]t would be clear to a person of ordinary skill in the art that interface links are elements of the interface link program, that the interface link program is the same as the link program, and that the link program is delivered to client

software in the manner described by the '884 application."); *see also* Oral Argument at 9:14–33 (citing this passage and summarizing that "when you're providing the interface links, you're necessarily providing the link program"). Intertainer did not identify any portion of the specification that disclosed that the remaining aspects of the link program (such as "interrupt[ing] . . ." or "access[ing] . . .") were provided over the network or associated with a video; instead, in its view, providing and associating "elements" of the link program was sufficient. Accordingly, Intertainer conceded during prosecution that the steps of "providing the link program over the network" and "associating the link program with the video" can be satisfied when only a portion (e.g., a stream of links) of a link program is "provid[ed]" and "associat[ed]."

Arguments that Intertainer made with respect to the examiner's anticipation rejections also support the Board's constructions. As discussed above, Intertainer used its "GAP Demo" embodiment to swear behind Wallenius, the examiner's anticipation reference. J.A. 349–51. However, as the examiner found, the GAP Demo only transmitted "hypervideo streams" and "additional data streams" (e.g., supporting metadata) over the network. *See* J.A. 408, 648. Indeed, in mapping the "GAP Demo" onto the particular elements of the claim, Intertainer argued that the "providing" step was disclosed because "'current prototypes use RMI to deliver compressed hypervideo streams' over the network." J.A. 615. The GAP Demo did not transmit or associate other aspects of the "link program," such as code to "interrupt streaming of the video at the remote storage medium." So here too Intertainer conceded that the claims do not require that an entire link program is "provid[ed]" or "associat[ed]."

In sum, the Board's constructions correctly capture the positions that Intertainer took during prosecution to obtain allowance. It did not err in construing these terms.

### III

Intertainer does not dispute that, under the Board's constructions, Chen anticipates the '246 patent. Accordingly, because we affirm the Board's constructions, we affirm the Board's decision that the '246 patent is invalid under § 102. We need not reach Hulu's alternative grounds for affirmance.

**AFFIRMED**